## Yaple *et al. versus* Titus *et al.*

*Jurisdiction of Common Pleas over Estates of Lunatics.— Order of Sale not void, though granted after Death of Lunatic.—Judgments either in rem or in personam, not impeachable collaterally.*

1. The real estate of a lunatic having been sold on petition of his committee for the payment of debts, in pursuance of an order of court, his heirs afterwards brought ejectment therefor against the vendee of the purchaser, and upon the trial offered to prove that the lunatic died before the order of sale was granted, which offer was rejected by the court: *Held*, that the evidence offered was properly excluded, for the Court of Common Pleas had jurisdiction over the *estate* of the lunatic, after his death, and the order of sale was therefore not void for want of authority to make it.

2. The judgment or decree of a court of competent jurisdiction cannot be reversed or inquired into in a collateral proceeding except for fraud ; therefore, though the order of sale might have been set aside on appeal from the decree of the court making it, yet after sale, in a collateral action of ejectment, the order will not be inquired into, where the court had jurisdiction, and there was no fraud.

3. Under the constitution and laws of Pennsylvania, the Court of Common Pleas has chancery powers in regard to the persons and estates of those *non compos mentis*, and through the committee exercise the power of a chancellor in the custody and management of the lunatic's estate, and in applying it to his support and that of his family, to the education of his minor children, and to the payment of his debts.

4. After the return of an inquisition finding lunacy, the jurisdiction of the court over the property is complete, either for custody, management, or sale.

5. A judgment rendered against a person after his death, is reversible, if the fact and time of death appear on the record, or in error *coram nobis*, if the fact must be shown *aliunde;* it is voidable and not void, and cannot be impeached collaterally ; still less is a decree *in rem*, as an order of sale, to be held void or impeached collaterally, when made after the death of the owner of the property.

ERROR to the Common Pleas of *Erie county*.

This was an ejectment for 100 acres of land in Venango township, Erie county, brought October 4th 1858, by David Yaple and Ruth M. Yaple his wife, who was a daughter and heir of Timothy Fuller, deceased, and the other heirs of said Fuller, against Daniel Titus, Rebecca Allison, and James Allison.

On the trial, the plaintiff showed title in Timothy Fuller, and the defendant, admitting that the plaintiffs are the heirs of Fuller, and that he died before the commencement of the suit, the plaintiffs gave in evidence the writ and rested.

[Yaple *et al. v.* Titus *et al.*]

The defendants contended that the title to the land in suit was in them. To sustain this, they gave in evidence the petition and proceedings had thereon, in No. 17 August Term 1841, in which Noble Fuller petitioned the judges of the Court of Common Pleas of Erie county, asking that a commission in the nature of a writ *de lunatico inquirendo* might issue to inquire whether "Timothy Fuller is *compos mentis* or *non compos mentis*." The petition is dated April 27th 1841, and was presented in court May 3d 1841, when A. W. Brewster and Lyman Robinson, or either of them, were appointed commissioners, and ten days' notice be ordered and given to Timothy Fuller, his wife, and Judah Brown, his brother-in-law. The commission, in proper form, was issued May 24th 1841. Upon the 10th day of June 1841, the commission was executed. It found

1. That Timothy Fuller was a lunatic.

2. That he had been so for the last two years.

3. That he was then seised of real estate, between 50 and 60 acres, situate in Venango township, Erie county, and valued at about $10 per acre.

4. That he was then possessed of personal property valued at $174.

5. That he had five sons and five daughters.

6. That he was then sixty-nine years of age, or thereabouts, and that his wife was then living.

The proceedings further showed that the finding of the inquest was confirmed by the court, November 12th 1842; that William B. Weed and Lyman Robinson were appointed June 18th 1841, to take care of the person and property of Timothy Fuller; that Lyman Robinson declined to act, and that Timothy Butler was appointed in his place.

These proceedings further showed that upon the 1st day of November 1842, William B. Weed and Timothy Butler petitioned the court to order the sale of the real estate of Timothy Fuller, on which there is a frame barn, log-house, and about 40 acres of cleared land. It set forth that Timothy Fuller then owned personal property to the value of $118, and that his debts amounted to $330, showing deficit of $202.

The proceedings further showed that on the 12th of November 1842, by endorsement on that petition, the court ordered the land to be sold. By a further endorsement on that petition it appeared that the order of sale was issued March 28th 1843, and was directed to William B. Weed and Timothy Butler.

The report of Weed and Butler is dated August 12th 1843, was sworn to November 5th 1843. In it they report that, on the 20th of April 1843 they offered the land, but did not sell it until the 12th of August 1843, when they sold it to A. E. Foster for $153.

[Yaple *et al. v.* Titus *et al.*]

The proceedings further showed that on the 9th of November 1843 that sale was set aside on the petition of Thomas Applebee, and the real estate ordered to be again exposed to sale; that it was so exposed, and on the 4th of March 1844, was sold to B. McQuillon for $230, and that the sale was confirmed May 11th 1844.

The defendants having given in evidence the chain of title for this land from McQuillon to them, rested.

The plaintiffs thereupon, for the purpose of showing that the sale of the real estate of Timothy Fuller, made March 4th 1844, on the order issued to Weed and Butler, November 12th 1842, and reissued November 9th 1843, was a nullity, and conveyed no title to the purchaser; called T. N. Fuller, and offered to prove by him that Timothy Fuller, the defendant, in the proceedings in No. 17, August Term 1841, died on the 6th of April 1842. To this the defendants by their counsel objected. The objection was sustained by the court, and at the request of the plaintiff's counsel, a bill of exceptions was sealed.

With the rejection of this evidence the plaintiffs closed. The court (DERRICKSON, P. J.) charged that the sale was legal, and vested a good title in the defendants.

There was a verdict and judgment accordingly. Whereupon the case was removed into this court by the plaintiffs, who assigned as a reason for reversing the judgment that the court erred in rejecting the evidence above mentioned.

*John H. Walker,* for plaintiffs.—The question presented is, have the committee appointed by the court to take care of the person and property of a lunatic, power, on an order issued by the court, to sell the real estate of the lunatic *after his death?* And it depends upon the construction to be given to the Acts of Assembly by which the committee are appointed, and by which their powers are given.

The 14th section of the Act of June 13th 1836, "relating to lunatics and habitual drunkards," gives to the committee no authority over the estate after the death of the lunatic. · The court may appoint one person to take care of the *person* and another of the *estate*, but evidently the enactment intends that the authority in both cases shall end with the death of the lunatic.

The 18th section gives the *management* of the real *estate* of the lunatic to the committee to pay debts, support the lunatic and his family, and educate his minor children.

The 22d section authorizes the Court of Common Pleas, having jurisdiction of the accounts of the committee of such person, if the personal estate be deficient, to make an order empowering such committee to sell at public sale, or mortgage such parts of

[Yaple *et al. v.* Titus *et al.*]

the same as the said court shall deem expedient. But no such order shall be made unless the application of the committee for the same be accompanied with certain statements and estimates which evidently contemplate a sale of the real estate during the life of the lunatic, because it provides for the sale of the real estate to realize a sum for the *support* of the *lunatic*, for the support of his family, and for the education of his children.

The 41st section, instead of authorizing the sale of the real estate after the death of the lunatic, provides that the *death of the lunatic terminates the trust.*

It is evident that no section of this act empowers the court to authorize the committee to sell the real estate after the death of the lunatic. It calls the interest the committee has over the person and property of the lunatic, *a trust;* and it expressly enacts that *death terminates that trust.* Cannot this be inquired into collaterally ?

De Gray, C. J., in the Duchess of Kingston Case, 11 State Trials 261, lays down the rule which our courts have followed : 4 Watts 183 ; Lockhart *v.* Johns, 7 Barr 139 ; Painter *v.* Henderson, Id. 48.

It is not contended that the judgment or decree of a court can be inquired into, much less reversed collaterally, unless there was fraud, or the court had no jurisdiction.

In this case there is no allegation that there was any fraud in effecting the sale of the real estate of Timothy Fuller by Weed and Butler, but that the Court of Common Pleas of Erie county could not, after the death of Mr. Fuller, order the sale of his real estate. That order was a nullity. The jurisdiction of the Common Pleas ended, and immediately upon his death the title of the real estate become vested in the plaintiffs, his legal representatives. That the Acts of Assembly only empowered the court to invest the committee with a *trust*, and that *death* ended the *trust*, except to settle for what had been done.

In Griffith *v.* Frazier, 8 Cranch 9, and McPherson *v.* Cunliff, 11 S. & R. 430, it is ruled that letters of administration on the estate of a living person are void. In Caldwell *v.* Waters, 6 Harris 79, Winter *v.* Perry, Cro. Eliz. 199, and Campbell *v.* Kent, 3 Penn. R. 80, it was held that a sale of real estate upon a *void* judgment can be inquired into collaterally for other reasons than fraud.

If the case is to turn upon the fact, whether the proceedings " *de lunatico inquirendo*" do or do not disclose the fact of the death of Mr. Fuller, the lunatic, before the sale of his real estate, we say those proceedings, if not expressly, at least by implication, clearly show that he was dead, not only when the sale was made, but before the petition for an order to sell. The offer was to prove that Mr. Fuller died on the 6th of April 1842. The record

[Yaple *et al. v.* Titus *et al.*]

shows that the petition for the order to sell was presented in court, and the order made November 12th 1842. That the order was issued March 28th 1843. That the land was sold, the first time, August 12th 1843. That, November 8th 1843, that sale was set aside, and an order for resale *then* issued; that it was sold a second time, March 4th 1844, and that sale was confirmed May 11th 1844—all long after his death.

The petition asking for an order to sell the real estate begins thus : " The petition of the undersigned committee of the person and estate of Timothy Fuller, *late of*," &c.; and then closes thus : " Your petitioners, therefore, pray the court to make an order authorizing your petitioners to sell said land for the purpose of *paying the debts charged against the estate of said Timothy*, and they will," &c.

In the schedule attached to the petition is this " estimate of the sum that will probably be required for *the payment of the debts incurred*, in the support and maintenance of the said Timothy Fuller and his family."

It is almost impossible to read this petition or schedule and not see that, *at its date, Timothy Fuller was dead.*

*James C. Marshall*, for defendant.—This case presents a single point, and the law ruling the same has long since been well settled. Whether the proceedings of the Court of Common Pleas of Erie county, in No. 17 of August Term 1841, a court of record having competent jurisdiction of the subject-matter, *are null and void*, or *can be rendered so by parol proof*, or can be so decreed *indirectly* in this ejectment, an original action, while its adjudications and proceedings remain *unreversed* and *in full force*, is the simple question presented in this case. Can there be any doubt about it ?

1. The plaintiffs have not the *colour* of *equity ;* they are the heirs of Timothy Fuller, who had contracted debts for his own and his family's support; and the land now claimed by these heirs had been sold at a judicial sale to *pay those debts*, and the money arising from said sale honestly appropriated to the payment of the same. The defendants do not claim title under the *heirs* of Fuller, but their title is *paramount*. The descent to the plaintiffs is *quo modo* suspended until the debts of the ancestor are paid; that descent is interrupted by the proceedings in the Court of Common Pleas, and finally *defeated* by the *judicial* sale. There are equitable estoppels which will estop a party from using a title which in good conscience ought to enure to the use of another: McPherson *v.* Cunliff, 11 S. & R. 426.

2. The Court of Common Pleas being a court of general jurisdiction, its judgments and decrees are conclusive in all matters within its jurisdiction, and cannot be reversed or avoided collat-

[Yaple *et al. v.* Titus *et al.*]

erally: Jackson *v.* Summerville, 1 Harris 369; Painter *v.* Henderson, 7 Barr 52; Lockhart *v.* John, Id. 137. This is a case where the purchaser of land under a judicial sale, with the proceedings all regular on their face, *bonâ fide* paid his money, took possession some eighteen years ago, and the law is well settled that a purchaser at judicial sale is not bound to look or inquire beyond the record. He has nothing to do with errors or mistakes of the court in matters of fact, and most unquestionably so when they do not appear of record: McPherson *v.* Cunliff, 11 S. & R. 433, 434; 2 Burr. 1009; Selin *v.* Snyder, 7 S. & R. 166; Commonwealth *v.* Greenwood Turnpike Company, 1 Con. Rep. 7.

The record of the Common Pleas, on which the defendant's title rests, is an entirety. If the plaintiffs had been permitted to prove the fact of the death of Fuller, after the finding him a lunatic, or *non compos mentis*, and before the sale of the real estate by the order of the Court of Common Pleas, the evidence would have availed them nothing. The whole proceedings, from the filing of the petition for a commission in the nature of a writ *de lunatico inquirendo* upon Timothy Fuller, until the confirmation of the sale of the land by the court, constitute but one record or proceedings—just the same as a judgment, *fi. fa.*, levy on real estate, inquisition, condemnation, *venditioni exponas*, sale by the sheriff, confirmation, and deed.

The death of either of the parties after *fieri facias* issued, does not prevent the *venditioni exponas* from issuing immediately upon the return of the *fi. fa.* levied on land, and the same condemned: Bleecher *v.* Bond, 4 W. C. C. R. 6. Upon the confirmation of the finding by the commission that Timothy Fuller was *non compos mentis*, he was civilly dead; and could do no act to bind himself, or his estate, any more than if he had been naturally dead. The committee of a lunatic stands in the same relation to the estate of the lunatic, so far as the same is necessary to pay debts contracted both before and after lunacy found, as the executors of a decedent where by the will the executors are directed to sell certain real estate for the payment of debts. In the case of executors, it is settled that the descent is cut as to the land directed to be sold by the executor, and the heir cannot recover in ejectment. The case of a lunatic is equally strong. The estate of both passes into the custody of the law, to be administered according to law, and the law will see that it is properly administered.

If the natural death of Fuller vacated the powers of the committee, what then? The answer the plaintiffs would give, would be that letters of administration would be granted, and the administration of the estate would go into the hands of another set of trustees. What benefit would either the creditors of Fuller or his heirs derive from that change? The estate is still in the custody of the law, and one trustee can administer as well as

[Yaple *et al. v.* Titus *et al.*]

another. The committee have commenced the administration, and the Act of Assembly makes no provision that the powers of the committee shall cease *upon* the death of the lunatic.

The 41st section of Act of 13th June 1836 makes no such provision as claimed by the counsel of the plaintiffs, nor can it be fairly construed to mean that upon the moment of the death of the lunatic, all powers of the committee instantly cease. The fair meaning of the section is, that the committee shall close up his trust, by finally finishing up all the business under his charge, and make a final close of the business. Of course the trust must come to a close after the decease of the lunatic. The main and only question in this case is conclusively settled in the case of Warder *v.* Tainter, 4 Watts 270.

The first three cases cited by plaintiff, The Duchess of Kingston's Case, Lockhart *v.* John, and Painter *v.* Henderson, are all in favour of the position taken by us, and sustain the doctrine that the judgments and decrees of a court having jurisdiction of the subject-matter cannot be impeached collaterally. The case of Griffith *v.* Frazier, 8 Cranch, is good law, but does not touch our case. The granting of letters of administration in that case was *totally void for want of jurisdiction*. The case of McPherson *v.* Cunliff sustains our position from beginning to end. In the case of Caldwell *v.* Walters, 6 Harris 79, the bond was void on its face. Campbell *v.* Kent, 3 Penna. Rep. 80, was a case of a judgment entered by an attorney upon a warrant of attorney given by the *wife* of the defendant in the judgment. The contest was between live creditors, testing *directly* the validity of the warrant of attorney given by the wife. If a sale of the real estate of the defendant in that judgment had been made by the sheriff, the purchaser would have taken a good title.

If the word *late* in the petition is to be taken as evidence of the death of Fuller at the time or before the filing of the petition, the writs and declarations in nearly every civil case in our courts would indicate the death of the defendants before suit commenced. Our writs of summons command the sheriff to summon A. B., *late* of said county; our declarations complain of A. B., *late* of said county, &c.; our indictments in the criminal courts charge A. B., *late* of said county, yeoman, &c. So also as to the word estate. When a committee is appointed, the assets belonging to the lunatic are called the *estate* of the lunatic, and the Act of Assembly provides that the committee shall take charge of the *estate* of the lunatic. A petition for the committee of any *live* lunatic for the sale of land to pay debts, which did not use the language claimed as indicating the previous death of the lunatic, would be a novelty.

The opinion of the court was delivered, January 6th 1862, by

[*Yaple et al. v.* Titus *et al.*]

STRONG, J.—This was an action of ejectment. The plaintiffs claimed as heirs of Timothy Fuller, of whose person and estate a committee was appointed on the 18th day of June 1841, under a commission of lunacy. In his lifetime he had been seised of the property in dispute, and he had died intestate. The defendants claimed under a sale, made by order of the Court of Common Pleas, for the payment of the debts of the lunatic, including also the expenses of his support and maintenance, and that of his family. The petition for the sale was presented by the committee, and an order to sell was granted on the 12th of November 1842. The first sale made was set aside by the court, but the land was again sold to one under whom the defendants claimed, on the 4th of March 1844, and the sale was confirmed on the 11th of May next following. These proceedings of the Common Pleas, on their face appear to have divested the title of Timothy Fuller. But to avoid their apparent effect, the plaintiffs offered to show at the trial that Fuller, the lunatic, died on the 6th day of April 1842, before the order of sale was granted. Whether it was competent for them to show that fact is the sole question before us.

It is a familiar principle that the judgment or decree of a court of competent jurisdiction cannot be reversed or inquired into in a collateral proceeding, except for fraud. Nor, standing on the public records, shall it be deemed a nullity, provided the magistrate had jurisdiction of the matter adjudicated. This principle is said to have no exception: Hazlett *v.* Ford, 10 Watts 101. No fraud is alleged in this case. But it is said that the Court of Common Pleas had no jurisdiction over the estate of Timothy Fuller after his death, and that consequently the order to sell and the sale made under it were void. It is not enough for the plaintiffs to show that they were erroneous, for errors of law, or even of fact, can be corrected only by writ of error or by appeal. It may be that the order of sale must have been set aside, had an appeal been taken from the court which made it. But the question now is, in this collateral action, whether the order was wholly void for defect of jurisdiction to make it.

The fifth article of the constitution of the state declares that the several Courts of Common Pleas shall have the power of a Court of Chancery, so far as relates to the care of the persons and estates of those who are *non compos mentis,* and authorizes the legislature to vest in the said courts such other powers to grant relief in equity as shall be found necessary. The power of a chancellor over the estate of a lunatic is that of custody, of management, and of application to the lunatic's support and that of his family, to the education of his minor children, and to the payment of his debts. Under our Act of Assembly this power is exercised through a committee, appointed by the court, and the

[Yaple *et al. v.* Titus *et al.*]

committee may be ordered to sell the real estate belonging to the lunatic, if the personal property is not sufficient for the purposes already mentioned. Yet the charge of the property is in the court, though administered by a committee. After the return of an inquisition finding lunacy, the jurisdiction of the court over the property of the lunatic is complete, either for custody, for management, or for sale. And, though his death necessarily terminates all jurisdiction over his person, there are not wanting cases which assert that jurisdiction over the property continues, for some purposes, even after death: Ex parte McDougall, 12 Vesey 384. See also Shelford on Lunacy, 22, 23, 24. To what extent this may be, the case now in hand does not demand that we should inquire. It is enough for our present duty that the Court of Common Pleas had complete jurisdiction over the property of Timothy Fuller, and might, without even any irregularity, have ordered a sale up to April 6th 1842. Did, then, his death on that day so completely oust the jurisdiction of the court over the property as to make a subsequent order of sale not merely erroneous but an absolute nullity? An order of sale was a proceeding *in rem*, and not a decree against the lunatic himself. Notice of it to him would have been unnecessary, had he been living. To justify it, the court needed no jurisdiction of his person. The Act of Assembly, under which the sale was ordered, contemplated no notice to the lunatic. Now it would seem to be well established that in civil proceedings against a person, his death does not so completely take away the jurisdiction of a court which has once attached, as to render void a judgment subsequently given against him. The judgment is reversible, in error, if the fact and time of death appear on the record, or in error *coram nobis* if the fact must be shown *aliunde*. But it is not void. Thus, in Rolle's Abr., vol. 1, 742, 6, 12, it is said, "if in a *cui in vita* the tenant dies, and afterwards judgment is against him, which is erroneous, and execution is sued against the heir, he shall not avoid the judgment in assize without error." " So in a *scire facias* by an executor, upon a judgment in ejectment by his testator against B., execution shall not be avoided nor judgment stayed by saying that the tenant died *pendente lite*, for he ought to avoid it by error:" 1 Rolle 742, 1, 18; 3 Comyn's Digest, *Error*, D. Without, however, citing the authorities at length, we refer to the opinion of Judge Kennedy in Warder *v.* Tainter, 4 Watts 279 *et seq.*, where a large number are collected. Other American cases not collected by him might be added. Thus in Coleman *v.* McAnulty, 16 Missouri (Bennett's Rep.) 177, it was ruled that a judgment rendered in favour of a plaintiff who had died before its rendition was not void. So in Collins *v.* Mitchell, 5 Florida 364, it was held that the death of the party defendant before judgment does not render the judgment void,

but only voidable upon a writ of error *coram nobis*. From the report of the case it would appear that the defendant died before the institution of the suit, which was commenced by attachment. See also Day *v.* Hamburg, 1 Browne 75. These authorities show unmistakably that even a judgment *in personam* is not void merely because the defendant died before it was rendered. At most it is only voidable, reversible in error, but not impeachable collaterally. And some of the cases deny that it can be reversed in error, when the averment of the error involves a contradiction of the record.

There is even less reason for holding a decree *in rem*, such as was this order of sale, to be void, if made after the death of the owner of the property. The reason why even a judgment *in personam* is voidable in error, is because the party against whom it was rendered has been deprived of an opportunity of showing cause against the plaintiffs' claim. But in a proceeding *in rem* he may, or may not, intervene. As already said, in an application for an order to sell the real estate of a lunatic, the law does not contemplate his being heard. He has lost nothing, therefore, by death. His property has been intrusted to the court, which is to exercise its discretion over both its custody and its sale. If then a personal judgment obtained against him after his death, jurisdiction of the person having once been acquired, would be only voidable, a decree for the sale of his property, the court having had jurisdiction over it, can be no more than voidable, though made when he had ceased to be in life.

The cases relied upon by the plaintiff are not in conflict with these views. Letters of administration on the estate of a living person, and the probate of the will of such a person, are of course void, for there never was any jurisdiction of the person or property. The bond and warrant of a married woman to confess judgment are void, and of course can authorize no judgment at all. The observation of Chief Justice Gibson, in his dissenting opinion in Campbell *v.* Kent, 3 Penna. Rep. 79, when remarking upon Randall's Case, 2 Mod. 308, and Warter *v.* Perry & Spring, Cro. Eliz. 199, was but a suggestion not called for by the case. He said that "perhaps the true ground of both these cases was that the judgment was not only injurious, but void, as having been rendered against a party not in existence, and therefore requiring no reversal to render it a nullity." That was, however, not the ground on which the cases were rested. Warter *v.* Perry & Spring was a *scire facias* against bail of Brooke, who pleaded that Brooke was dead the day of the judgment given. "The court," says the reporter, "first held it no plea, for it goeth in avoiding the judgment, and proveth it to be erroneous, which cannot be avoided but by error. But they might plead the death of Brooke before *scire facias* and after judgment, for

[Yaple *et al. v.* Titus *et al.*]

then they could not bring in the body. But afterwards the plea was received because they cannot have a writ of error to reverse the judgment." If this be a correct report of the case, it shows that the plea was received for an entirely different reason from that suggested by Judge Gibson, *scil.* that the judgment was void. The reason given was, that the pleaders were not in privity with the defendant, and could not sue out a writ of error. And it seems that the plea was receivable at all events, not necessarily impeaching the judgment; for whether the defendant died before or after judgment, the bail could not bring in his body. The same case is reported in Leonard, part 2, case 125, and there it appears that the defendants were only permitted to plead that Brooke was dead after judgment, that not amounting to a surmise against the judgment. This report makes the case accord with other rulings that a judgment may not be attacked by showing collaterally that the defendant was dead before it was rendered. In Randall's Case, 2 Mod. 308, which was debt upon a bond against one as administrator, he pleaded a judgment recovered against his intestate, and that he had not assets ultra. The plaintiff replied that the intestate died before judgment, and that after his death judgment was obtained and kept alive *per fraudem.* The defendant rejoined traversing the fraud, but did not answer the death of his intestate, and upon a demurrer it was argued for the plaintiff that the judgment was ill, and that he, being a stranger to it, could neither bring a writ of error or deceit, and had no other way to avoid it but by a plea; and that it is put as a rule that when judgment may be reversed by writ of error, the party shall not be permitted to do it by plea, but a stranger to it must avoid it by plea, because he is no party to the judgment; as if a *scire facias* be brought against the bail, it is a good plea for them to say that the principal was dead before judgment given, by way of excusing themselves to bring in the body; but it is not good to avoid the judgment, because it is against the record which must be avoided by writ of error. The reporter in Modern adds: "The court were of opinion that the plaintiff might avoid the judgment without a writ of error, especially in this case, where it is not only erroneous but void." It is not easy to understand for what reason the court were of opinion that the judgment was void, whether for fraud or for the death of the defendant's intestate. The principal thing argued and decided was that a stranger might attack a judgment by plea, when one in privity would be put to a writ of error. And the case is cited by Baron Comyn, as deciding only that if a party cannot have error, he may avoid a judgment by plea: 3 Com. Dig., *Error* D, p. 569. As a general proposition, even this may be doubted. But if it be taken as good law, it does not help the plaintiffs in the present case, for they claim as heirs of Timothy Fuller, and in privity with him. They might, therefore, have

[Yaple *et al. v.* Titus *et al.*]

assailed the decree of the Court of Common Pleas, directly by appeal. The language of the court in Caldwell *v.* Waters, 6 Harris 79, also cited by the plaintiffs, is no more than a quotation from the dissenting opinion of Judge Gibson, already noticed. The industry of the counsel has not found any case which rules that a judgment against a defendant, who died before it was given, is, on that account, *ipso facto* void, much less any that treats as a nullity a judgment *in rem*, because of the previous death of the owner. As we have seen, there are numerous decisions to the contrary.

Had, therefore, the plaintiffs been permitted to prove that Timothy Fuller died before the order of sale, it would have availed them nothing. It would not have annulled the order, though it might have shown it to have been erroneous. The evidence offered was, therefore, properly excluded.

We feel the more satisfaction in coming to such a conclusion in this case, for it results in obvious justice. The property was sold eighteen years ago. It was sold for the payment of the debts of the lunatic, a part of which were debts due these very plaintiffs. The heirs of the lunatic knew of the order to sell, and of the sale, for some of them moved the court to set aside the first sale made under the order, not on account of his prior death, but because it was believed the property would bring more if offered for sale again. It would be a great hardship, if, after all this, and after the lapse of eighteen years, the heirs could now recover the land from purchasers who bought on the faith of a judicial decree, and who may have greatly improved the land and enhanced its value.

The judgment is affirmed.